ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2007 NOV 16 PM 12: 32
CLERK_____
SO. DIST. OF GA.

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CV 101-162 |
| ) | |
| UNITED STATES CURRENCY ) | |
| TOTALING $101,270.00 ) | |

## O R D E R

On October 19, 2001, Plaintiff, the United States of America, filed a Verified Complaint In Rem, alleging that the property at issue, $101,270.00 in United States currency and all accrued interest thereon, is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). Claimant Reginald Reid contests the forfeiture and seeks return of the $101,270.00. The Court conducted a bench trial in the matter on October 23, 2007. Based upon the testimony and exhibits received at trial, and upon the record of the proceeding, the Court now enters its decision by this written order, incorporating by reference the findings of fact and conclusions of law stated at the conclusion of the trial.

### FINDINGS OF FACT

The $101,270.00 was seized by law enforcement officials during a traffic stop of Mr. Shonnard Reid, the claimant's

father, in McDuffie County, Georgia, on April 24, 1999. During the trial of October 23, 2007, the Court heard testimony from McDuffie County Deputies Shea Bunch[1] and J. Henry Campbell, and Officer Jared Land of the Thomson Police Department. In general, I found the testimony of these officers to be credible, reliable and consistent without being contrived. Further, I find the conduct of these officers during the stop, to include the search of Shonnard Reid's person and the vehicle and the seizure of marijuana, a loaded handgun and the currency, to be professional and beyond constitutional reproach.

On April 24, 1999, shortly before 3:00 p.m., Deputy Campbell clocked by radar a 1999 Dodge Durango traveling 96 miles per hour in a 70 mph zone on Interstate 20 eastbound. Shonnard Reid, the driver and sole occupant of the vehicle, saw Deputy Campbell's marked police vehicle cross over the median of the interstate; thereupon Shonnard exited the interstate at Exit 172 in McDuffie County, Georgia. Deputy Campbell had turned on his blue lights and siren to stop the Durango. Shonnard attempted to elude Deputy Campbell by first pulling behind a restaurant off of the interstate, bypassing two gas stations closer to the exit ramp. When Deputy Campbell spotted the Durango behind the restaurant, Shonnard

---

[1] Mr. Shea Bunch is no longer a law enforcement officer.

2

exited the restaurant, crossed the road at an excessive rate of speed, and entered a Wendy's parking lot using the exit driveway. Shonnard backed the Durango into a parking space, opened the door, and exited the vehicle. Deputy Campbell also exited his police vehicle.

Deputy Campbell asked for Shonnard Reid's driver's license and the vehicle's registration. Shonnard produced his license and a rental agreement for the vehicle, which indicated that on that same day at 11:02 a.m., Chastity M. Payton had rented the Durango in Atlanta for a two day period. Katrina Blount was listed as an additional authorized driver. The rental agreement stated: "Only an authorized renter may drive this car." Shonnard Reid stated that he was an authorized driver, but it turns out that he was not.[2]

Once Deputy Campbell stopped the Durango at the Wendy's, he called for backup. Deputy Bunch arrived within minutes of the call and participated in questioning Shonnard Reid. Shonnard told the officers that he was traveling from Atlanta to Augusta to meet his brother at an Augusta State University basketball game. He had planned to meet his brother at the

---

[2] Shonnard initially claimed that Chastity Payton was his girlfriend, but then changed his story and said Katrina Blount was his girlfriend and Ms. Payton was his brother's girlfriend. When asked for Ms. Blount's telephone number, Shonnard tried to read the number from the rental agreement indicating that he did not know it.

Augusta mall; yet, Shonnard could not provide the officers with his brother's cell phone number or address. Instead, Shonnard provided his father's name, home phone number and address in Columbia, South Carolina.

Both deputies testified that Shonnard Reid appeared extremely nervous and both witnessed a white film in the corners of his mouth, an indicator of stress. Deputy Bunch stated that he was visibly shaking. According to Deputy Campbell, Shonnard kept trying to reenter his car to answer his cell phone and once had to be physically restrained from doing so. When initially asked whether he had any weapons in the car, Shonnard suspiciously responded: "No, and you have no reason to search it." When Deputy Campbell asked whether he any weapons on his person, Shonnard volunteered: "No, I have $500 in my front pocket." This statement also turned out to be false. When Deputy Bunch performed a Terry search of Shonnard, he found $370 in one pocket and a clear plastic bag containing $3,000 in his other pocket. The $3,000 was separated into $100 increments. Initially, Shonnard claimed the $370 as his money and that the $3000 belonged to his brother. Later, Shonnard claimed the $3000 was his father's and that it had been earmarked for a relative's sports team.

Based upon the totality of the circumstances, Deputy Bunch requested a canine unit. Only thirty-three minutes

4

after the initial stop, Officer Land arrived with his canine partner.[3] Prior to the canine search, Deputy Bunch asked Shonnard whether there were any weapons, drugs or currency over $10,000 in the vehicle, to which he replied "no."

In conducting the search, the dog first alerted to the driver's side door. Officer Land opened the door but saw the money that had been taken out of Shonnard's pockets on the front seat. Consequently, Officer Land put the dog inside the car on the passenger side, at which point the dog alerted to a spot between the center console and driver's seat. A small plastic bag of marijuana was located in this area. The dog was also placed in the vehicle through the back door, at which time he alerted to a black duffle bag located in the very rear of the Durango.[4] The officers found a loaded Lorcin .380 caliber handgun and three plastic bags containing cash in a total amount of $97,900.[5] It was later determined that the handgun was purchased on June 12, 1998, and registered to Mark

---

[3] Officer Land was on duty at the hospital in Thomson when he received the request for canine assistance, so he had to leave the hospital and go to police station to get his canine cage car, then to his home to retrieve the canine before proceeding to the Wendy's. It took Officer Land only 19 minutes to arrive at Wendy's from the initial call.

[4] Officer Land testified that the dog put his front two paws up on the back seat and "pointed" to the black bag behind the seat.

[5] The three plastic freezer bags contained $50,000, $20,000, and $27,900 respectively.

Eugene Highfield of Acworth, Georgia. The duffle bag also contained men's clothing and personal hygiene items.

At some point during the stop, Deputy Bunch asked the dispatcher to call the rental company to confirm whether Shonnard Reid was an authorized driver. The rental company informed dispatch he was not and requested that the vehicle be impounded.

The officers ultimately arrested Shonnard Reid. He was taken to the McDuffie County Sheriff's Office. While at the Sheriff's Office, the officers took a written statement from Shonnard Reid around 8:30 p.m. In the statement, Shonnard admits that he saw Deputy Campbell turn around to pursue him on the interstate but did not stop. He denied any knowledge of the marijuana, gun or money. He stated that he had not seen the items in the vehicle. Importantly, Shonnard never made any mention of his father during the interview or in the written statement. In particular, he never stated at any time that the money belonged to his father.

Deputy Campbell wrote tickets to Shonnard for possession of a weapon during the commission of a crime; possession of marijuana, less than an ounce; and carrying a concealed weapon. Shonnard ultimately pled guilty to the drug charge.

The claimant of the money in the case is Reginald Reid, Shonnard's father. Reginald claims to be a truck driver by

trade. He claims that he was in Atlanta the week of the stop with $100,000 in cash to buy equipment for a land-clearing business venture at auctions. Reginald claims he had left the money at the home of his ex-wife in Marietta, Georgia, without her knowledge, when he stayed with her for two nights while in Atlanta. Reginald claims he had instructed Shonnard to bring the money back to his home in Columbia, South Carolina. At deposition, Reginald claimed that he had left the money in the guest bedroom of his ex-wife's five-bedroom house. Yet, his ex-wife and Shonnard both testified that they had been living in a two-bedroom apartment at the time.

The inconsistencies in the stories of both Shonnard and Reginald only begin there. Reginald claims to have called his son the night before the trip to ask him to bring the money. Shonnard testified in his deposition that his dad called him that morning and asked him to take it back to Columbia even though Reginald was allegedly still in the Atlanta area at the time.

Reginald claimed in his deposition that he was driving back to Columbia from Atlanta on the day of the stop in his eighteen wheeler and that somewhere between Madison and Thomson, Georgia, he and Shonnard met up and followed each other until Shonnard pulled off to the side of the highway. Reginald said he learned of Shonnard's stop when he got to

7

Exit 1 in South Carolina, at which time he unhooked his load, leaving it somewhere in Aiken County, turned around and went back to Thomson. The Court notes that Exit 1 in South Carolina is only 30 miles from Thomson. It is inexplicable that Reginald would have received word of his son's stop in that short of time frame, considering that Shonnard was not taken to the police station until an hour and a half after the initial stop. Of note, it is curious that Shonnard offered his father's home phone number to the police officers if he knew his father was on the road in front of him.

At trial, Reginald denied this sequence of events, often stating that the deposition transcript must be wrong. Reginald told the Court instead that he did not meet up with Shonnard on the interstate and that he did not stop and unhook his load. Rather, he proceeded to his home in Columbia and returned to Thomson later that evening. Further, Reginald testified in deposition that he spoke to McDuffie County Sheriff Logan Marshall on the day of and the day after Shonnard's arrest. At trial, Sheriff Marshall denied having any conversation with Reginald. Interestingly, Nellie Reid, Reginald's wife, testified in deposition that Reginald had been in Columbia that day waiting for Shonnard to bring him the money.

Of greatest significance to this Court is the fact that

an eighteen-year-old, entrusted with the life savings of his father, would disavow any knowledge of the money during questioning, not only at the scene of the stop but five hours later during a voluntary interview. In fact, both Reginald and Shonnard admitted at trial that Reginald told Shonnard that if he was stopped, then "you don't know anything." This is hardly reasonable advice from a father who has entrusted legally earned money in the hands of his teenage son, notwithstanding Reginald's belief that this is a common sense approach for any black man who is stopped by law enforcement.[6]

With respect to Reginald's accumulation of over $100,000.00 in cash, he testified at trial that he "had the money around." Reginald claims that in 1992, six and a half years before the seizure, his wife took out a mortgage on her property through which she gave Reginald a $45,000 cash gift. He then allegedly turned the money over and over through the years, using an economic theory unique to his family that he

---

[6] At this point, the Court notes that Reginald Reid claims that many of the matters touching upon this case are somehow exclusive to a black racial culture and black economics; thus, this Court cannot understand these aspects of his or his son's behavior. Yet, he omits from his pontificating that his son, who has a prior felony drug conviction, who was driving at a reckless rate of speed in a rented automobile that he had no authority to drive, and who was transporting over $100,000 in cash, a loaded handgun, and drugs, was stopped by a black deputy (Deputy Campbell), who works for a black elected sheriff, Logan Marshall.

called "totism."[7] He claims to have obtained other monies through the sale of 4 or 5 trucks.[8] Contrarily, his wife Nellie testified by deposition that Reginald spent the original $45,000 on equipment and that Reginald owned only three trucks.

While Reginald Reid claims he earned a gross income of $100,000 per year through the 1990's, he failed to file individual tax returns during any of the years in which he claims to have legitimately accumulated such a large sum of money. Rather, Reginald only filed joint income tax returns in 1990, 1991, and 1992, showing joint earnings with his wife of between $14,000 and $18,000 per year. Moreover, in the 1990's, only three 1099 forms had been issued to Reginald in 1998, which evidence an income of only $60,000; that year, Reginald's wife declared Reginald as a dependent and described him as "other."

Further, Reginald filed bankruptcy three times, the first time in March 2000). Through these bankruptcy proceedings, Reginald claimed to have been in arrears on his mortgage payment by 25 months ($25,000) - which shows that Reginald was

---

[7] Reginald Reid further explained that "totism" is a black folklore way of keeping and turning over money that no one of non-black descent could understand.

[8] In fact, Reginald Reid testified in deposition that he owned 10 trucks at one time through his trucking company.

10

at least ten months behind in mortgage payments at the time of the seizure.[9] Inconceivably, Reginald claims ownership of over $100,000 in cash at the same time. In response, Reginald claims to be an alleged victim of predatory lending and thus was withholding the money from his mortgage company upon someone's advice. Yet, he also claims to have been willing to spend these allegedly withheld mortgage payments on equipment to start a land clearing business, and, to a lesser extent, to donate it to a youth sports team.

In this statement of facts, the Court has not attempted to catalogue every factual inconsistency between Shonnard's and Reginald's testimonies in their respective depositions or at trial. As the enumerated inconsistencies demonstrate, Reginald Reid has "as much regard for the truth as a tomcat has for married life."[10] As mentioned at the conclusion of the trial, as I listened to the testimony of Reginald and Shonnard Reid, the Latin refrain echoed in my mind: "Falsus in Uno, Falsus in Omnibus." In short, I do not believe any statement made by Reginald or Shonnard that would tend to support Reginald's claim that the money legitimately belongs to him.

---

[9] His wife knew nothing of the arrearage.

[10] The aptly descriptive words of Peter Zack Geer, Lieutenant Governor of Georgia, 1963-1966.

11

Further, it astounds me that Reginald Reid maintains his claim to the money while all his inconsistencies and fabrications bring him dangerously close to charges of tax evasion, bankruptcy fraud and perjury. This demonstrates the brashness with which Reginald Reid conducts himself and his abject disregard for the judicial process and the oath that he has taken on two occasions.

Finally, the Court takes note of the testimony of Michael Marbert, Special Agent with the Drug Enforcement Agency, in which he testified that bulk currency in the drug trade is typically segregated in plastic bags and wrapped in rubber bands. Other indicia of drug money include the rental of a vehicle by a third party and the presence of a weapon. A "drug mule" evades capture by law enforcement, denies all knowledge of any money or drugs, and often retains for himself a "personal use" amount of drugs. Finally, Atlanta is known as a source city of marijuana, cocaine, and methamphetamine, and traveling with large amounts of cash to and from Atlanta under the circumstances is likely indicative of drug activity.

## CONCLUSIONS OF LAW

As an initial matter, the Court concludes that any implied constitutional challenge to the search and seizure of April 24, 1999, is hereby rejected. First, Reginald Reid, as

claimant, does not have standing to challenge the search and seizure. Second, an unauthorized driver of a rental car has no legitimate expectation of privacy in the rental car. See, e.g., United States v. Wellons, 32 F.3d 117 (4th Cir. 1994). Moreover, the rental company had asked that the police officers to impound the vehicle, which would subject the vehicle to an inventory search. See Sammons v. Taylor, 967 F.2d 1553 (11th Cir. 1992). Finally, once the canine alerted to the car, the officers had probable cause to search the vehicle. See United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998); United States v. Banks, 3 F.3d 399 (11th Cir. 1993).

On October 19, 2001, Plaintiff United States filed this civil forfeiture case pursuant to 21 U.S.C. § 881(a)(6), which provides in relevant part as follows:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> (6) All moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter.

In this case, the Government has proffered two alternative theories of forfeiture: that the $101,270.00 was proceeds of a drug transaction(s) or that it was used or intended to be

used to facilitate a drug-related offense.

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), codified in part at 18 U.S.C. § 983, governs the Government's claim. Under CAFRA, the Government must prove by a preponderance of the evidence that the defendant property is subject to forfeiture. Thus, to prevail in the present case, the Government must show by a preponderance of the evidence that the currency at issue was the proceeds of drug offenses or used or intended to be used to facilitate a drug offense. Under CAFRA, forfeiture of facilitating property requires a "substantial connection" between the offense and the property. See 18 U.S.C. § 983(c)(3). The substantial connection requirement does not apply in proceeds cases. United States v. $21,000 in U.S. Postal Money Orders, 298 F. Supp. 2d 597 (E.D. Mich. 2003); see United States v. $10,700.00 in U.S. Currency, 258 F.3d 215, 222 n.4 (3d Cir. 2001).

In general, the Government may rely upon circumstantial evidence to show that money is proceeds of a crime. Moreover, the money does not have to traceable to a specific offense. United States v. $242,484.00, 389 F.3d 1149, 1160 (11th Cir. 2004) (in a civil forfeiture case based on drug trafficking, the Government does not have to show a relationship between the property and a particular drug transaction). This Court has reviewed similar CAFRA cases in other circuits and takes

note herein of the circumstantial evidence by which the various courts have established forfeiture: United States v. $252,300.00 in U.S. Currency, 484 F.3d 1271 (10th Cir. 2007) (quantity of currency, packaging with rubber bands in plastic bags, inconsistent statements and lack of documentary support for explanation, odor of marijuana, driver's nervousness, concealment of money in a locked box, and driving on a "known drug route" establish forfeiture); United States v. $124,700 in U.S. Currency, 458 F.3d 822 (8th Cir. 2006) (quantity of currency, implausible story and false statements, travel itinerary, and dog sniff were sufficient to establish a substantial connection between currency seized from a courier and drug trafficking); United States v. $30,670 in U.S. Currency, 403 F.3d 448 (7th Cir. 2005) (dog sniff, coupled with circumstantial evidence - purchase of one-way ticket with cash at full price, frequent travel to drug source city, quantity of currency concealed in woman's girdle on courier's person, inconsistent statements, lack of legitimate income, initial denial of ownership, and implausible story proven false by follow-up investigation - satisfied preponderance of the evidence standard); United States v. $110,873.00 in U.S. Currency, 159 Fed. Appx. 649 (6th Cir. 2005) (unusually large amount of currency, failure to file tax returns, presence of small amount of drugs, dog's alert to the currency, and

previous currency seizures to which dogs alerted constituted sufficient evidence); <u>United States v. $369,980 in U.S. Currency</u>, 214 Fed. Appx. 432 (5th Cir. 2007) (quantity of currency, manner of packaging, concealed compartment, dog alert, absurd explanation and lack of legitimate income, taken together, were sufficient to sustain a jury's verdict of forfeiture). In a pre-CAFRA case, the Eleventh Circuit found that the quantity and packaging of cash, travel to and from a source city, use of a courier, dog sniff, courier's inability to identify persons from whom she received cash or to provide receipts, improbable and inconsistent story, and failure to file a claim were sufficient to establish probable cause to forfeit the currency. <u>United States v. $242,484.00</u>, 389 F.3d 1149 (11th Cir. 2004).

In the instant case, indicia of drug activity abounds. An extraordinarily large amount of currency, located in a bag with a loaded gun, was found in a vehicle driven by an unauthorized driver, rented by a third party.[11] A canine alerted on the bag and a small amount of marijuana also found in the vehicle. The currency was packaged in plastic bags. The driver, Shonnard Reid, was previously convicted on a

---

[11] In <u>United States v. $121,100.00 in U.S. Currency</u>, 999 F.2d 1503, 1507 (11th Cir. 1993), the Eleventh Circuit stated that the quantity of cash seized may be highly probative of a connection to some illegal activity.

16

felony charge of distribution of marijuana. He appeared extremely nervous and denied any knowledge of the gun, drugs, or money at all times. More importantly, he failed to tell anyone that the money belonged to his father on the day of his arrest. Finally, the wildly inconsistent and false statements of both Reginald and Shonnard Reid are further circumstantial evidence of illegal activity. Reginald failed to provide any plausible or legitimate explanation for the origin of the money; rather, his explanations at every turn were nothing short of ludicrous. In short, this circumstantial evidence establishes by a preponderance of the evidence that there exists a "substantial connection" between the currency and the drug trade. Accordingly, the Government has sustained its burden of establishing that the $101,270.00 was either proceeds of a drug offense or was used or intended to be used to facilitate a drug offense.

Reginald Reid claims that the $101,270.00 at issue belonged to him and that Shonnard was simply transporting it to him. For the reasons previously discussed, namely the rampant inconsistencies and gross manipulations of the truth, the Court does not find Reginald's testimony regarding his claim of ownership to be credible. It is therefore not legally sufficient, when considered with the other evidence discussed herein, to undermine the preponderance of the

evidence demonstrating that the money is subject to forfeiture.

To the extent that Reginald Reid asserts the "innocent owner" defense set forth in 18 U.S.C. § 983(d), it is to no avail. An essential element of such claim is the establishment of an ownership interest in the specific property. Here, Reginald Reid has utterly failed to present any credible evidence that he was the innocent owner of the currency found in another's vehicle. Moreover, such a claim is incompatible with his claim that the money constituted proceeds legitimately derived from other sources and is not derivative of any drug-related transactions. See <u>United States v. $47,500 in U.S. Currency</u>, 2007 WL 1032369, *8 (W.D. Mich. March 30, 2007) ("The 'innocent owner' defense is inapplicable where a claimant asserts that the defendant property is unconnected to any illegal transaction."); <u>United States v. $22,991.00, more or less, in U.S. Currency</u>, 227 F. Supp. 2d 1220, 1232 n.4 (S.D. Ala. 2002).

### ORDER AND JUDGMENT

Upon the foregoing, **IT IS HEREBY ORDERED AND ADJUDGED** that

    a)     $101,270.00 and all accrued interest thereon is hereby condemned and forfeited to the United States

of America, and all right, title, and interest in the forfeited $101,270.00 and all accrued interest is vested in the United States;

b) All claims and interest to the forfeited $101,270.00 and all accrued interest in United States currency by claimant Reginald R. Reid, Sr. and all other persons and entities are forever barred;

c) All expenses of the Department of Justice and United States Marshals Service related to the seizure, detention, advertising, and forfeiture of the $101,270.00 and accrued interest in United States currency be paid from the forfeited currency;

d) The remainder of the forfeited $101,270.00 and all accrued interest in United States currency, after the payment of costs and expenses, be deposited into the Department of Justice Asset Forfeiture Fund in accordance with 28 U.S.C. § 524(c) and 21 U.S.C. § 881(e); and

e) All parties bear their own costs relating to the seizure, detention, and forfeiture of the defendant currency.

**ORDER ENTERED** at Augusta, Georgia, this 16th day of November, 2007.

_____
UNITED STATES DISTRICT JUDGE

19